**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------X

SHERRY GRIMES-JENKINS,                              Civil Action No.: 16-cv-04897-AT-RWL

            Plaintiff,                      Related Civil Action No.:
                                                    18-cv-01545-AT-RWL

   -against-

CONSOLIDATED EDISON COMPANY
OF NEW YORK, INC.,

          Defendant.

-----------------------------------------------------X

## PLAINTIFF SHERRY GRIMES-JENKINS LOCAL RULE 56.1 COUNTER-STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff Sherry Grimes-Jenkins. (hereinafter sometimes "Plaintiff" and/or Grimes-Jenkins") submits her Counter-Statement of Undisputed Material Facts pursuant to Local Rule 56.1 of the Local Rules of United States District Courts for the Southern and Eastern Districts of New York, in opposition to Defendant Con Edison's Statement of Undisputed Material Facts.

PLEASE TAKE NOTICE no objection including as to relevancy at trial is deemed waived herein.

### I. RELEVANT PARTIES

1.     Con Edison is a New York corporation, and is one of the nation's largest publicly regulated energy utilities that provides electric, gas, steam, and renewable energy service in New York City as well as Westchester, Orange, and Rockland counties. (Karakatsanis Decl. ¶ 2.).

**RESPONSE:** Admit.

2.     To provide electric, gas, steam, and renewable energy service in New York City, Con
Edison operates electricity transmission substations throughout New York City, including
Manhattan, New York ("Manhattan Substations"). (Karakatsanis Decl. ¶ 3.) The
Manhattan Substations has various locations, including Astor, West 42nd Street, West 49th
Street, and East 63rd street. (Karakatsanis Decl. ¶ 4.).

**RESPONSE:** Admit.

3.     The Manhattan Substations is separated into various sections, including the Electric
Construction Bureau ("ECB Section"). (Karakatsanis Decl. ¶ 4.) From May 2012 to July
1, 2018, the Area Manager of the Manhattan Substations, ECB Section was Eric Galloza
("Galloza") (Karakatsanis Decl. ¶ 5.) The General Manager in turn reports to the Area
Manager at the Manhattan Substations. (Karakatsanis Decl. ¶ 5.) From 2008 to July 2016,
the General Manager of the Manhattan Substations was Bruce Gavioli ("Gavioli").
(Karakatsanis Decl. ¶ 7.) In July 2016, Thomas Karakatsanis ("Karakatsanis") became the
General Manager of the Manhattan Substations. (Karakatsanis Decl. ¶ 1.) Thomas Nolan
was a supervisor within the Manhattan Substations from January 2012 to April 2017.
(Karakatsanis Decl. ¶ 6.).

**RESPONSE:** Admit except to the extent that the exact dates are upon information and belief.

4.     The Utilities Workers Union of America, Local 1-2, AFL-CIO ("Local 1-2") represents
union Con Edison employees. (Grimes-Jenkins Dep. 49:3-7; Karakatsanis Decl. ¶ 8.). The
Collective Bargaining Agreement governs the relationship between Local 1-2 Con Edison
employees and Con Edison. (Karakatsanis Decl. ¶ 9, Ex. A.).

**RESPONSE:** Admit.

5.    Plaintiff Sherry Grimes-Jenkins ("Grimes-Jenkins" or "Plaintiff") is a former Mechanic A

L1-2 who was employed by Con Edison and worked at the Manhattan Substations, ECB

Section. (Grimes-Jenkins Dep. 65:23-66:2.) Con Edison terminated Grimes-Jenkins's

employment effective on July 13, 2017. (Grimes-Jenkins Dep. 66:16-67:2.).

**RESPONSE:** Admit except as to the exact date which was July 24, 2017.

## II. CON EDISON'S POLICIES AGAINST
## DISCRIMINATION, HARASSMENT, RETALIATION

6.    It has always been and continues to be Con Edison's policy to promote diversity in the

workplace and maintain a culture of respect and dignity. (Pierre Decl., Ex. B at GRIMES-

JENKINS 001046.) As such, Con Edison has established policies that ensure that

employees should be able to enjoy a workplace that is free from all forms of unlawful

employment discrimination and harassment. (Pierre Decl., Ex. B at GRIMES-JENKINS

001046-1047.) To that end, Con Edison maintains strong Policy on Equal Employment

Opportunity ("EEO Policy"), which prohibits, among other things, discrimination with

respect to all personnel actions under several protected classifications, including race and

gender. (Pierre Decl., Ex. B at GRIMES-JENKINS 001046.).

**RESPONSE:** Admit but only to the extent that there were stated polices but without admission

that such polices were followed, nor that any violations were ever punished.

Notably, there have been various reports of such violations, some of which are set

forth as **EXHIBIT "A"** as annexed hereto. Thus, the cases show that

notwithstanding the stated policies ConEd has had a history of violations and

watchdogs, which have allegations sounding extremely like those of this Plaintiff.

3

7.     The EEO Policy applies to all areas of employment with Con Edison, including hiring, terminating, promoting, evaluating, and providing benefits, compensation, job assignments, training, tuition assistance, transferring, and any other action that affects terms of employment. (Pierre Decl., Ex. B at GRIMES-JENKINS 001046.).

**RESPONSE:** Admit but only to the extent that there were stated polices but without admission that such polices were followed, nor that any violations were ever punished.

8.     The EEO Policy also prohibits, among other things, harassment based on several protected classifications, including race and gender. (Pierre Decl., Ex. B at GRIMES-JENKINS 001047.) Under the EEO Policy, harassment includes verbal or physical conduct that denigrates or shows hostility or aversion toward an individual because of several protected classifications, including race and gender. (Pierre Decl., Ex. B at GRIMES-JENKINS 001047.).

**RESPONSE:** Admit but only to the extent that there were stated polices but without admission that such polices were followed, nor that any violations were ever punished.

9.     Con Edison encourages any employee who believes that he or she has been subjected to any conduct that violates the EEO policy to report such beliefs to a Human Resources professional, the Office of Diversity and Inclusion, a supervisor, the company's EEO or Ethics hotlines, or an online complaint form. (Pierre Decl., Ex. B at GRIMES-JENKINS 001049.) The Equal Employment Opportunity Affairs Department ("EEOA") is the predecessor department to the ODI. (Flynn Decl. ¶ 1.) All complaints are kept in the strictest confidence expect to the extent that disclosure is required to conduct an adequate investigation or take any remedial steps. (Pierre Decl., Ex. B at GRIMES-JENKINS 001050.) In the event that Con Edison identifies unlawful conduct, Con Edison will take

whatever appropriate corrective action it deems necessary to ensure the inappropriate behavior stops. (Pierre Decl., Ex. B at GRIMES-JENKINS 001050.).

**RESPONSE:** Admit to the extent that such is the alleged stated policy though there is an unwritten underground policy of tolerance as to violative behavior or a "(ConEd) blue wall of silence".

10.   Con Edison expressly prohibits its employees from engaging in retaliation against anyone who, in good faith, makes a complaint, assists another to complain, or participates in an investigation regarding a complaint. (Pierre Decl., Ex. D at GRIMES-JENKINS 001032.) There is no tolerance for retaliation at Con Edison. (Pierre Decl., Ex. D at GRIMES-JENKINS 001035.).

**RESPONSE:** Admit but only to the extent that there were stated polices but without admission that such polices were followed, nor that any violations were ever punished.

11.   Con Edison also maintains and publicizes a strong Policy on Sexual Harassment, which strictly prohibits unwelcome conduct based on gender. (Pierre Decl., Ex. D at GRIMES-JENKINS 001032.) Namely, Con Edison emphasizes that employees have the right to work in a comfortable environment free from discrimination and harassment based on their protected characteristics, including gender. (Pierre Decl., Ex. D at GRIMES-JENKINS 001032.) Consistent with its policies, Con Edison does not permit or tolerate any acts of sexual harassment. (Pierre Decl., Ex. D at GRIMES-JENKINS 001032.).

**RESPONSE:** Admit but only to the extent that there were stated polices but without admission that such polices were followed, nor that any violations were ever punished.

12.   Employees are trained and instructed that they are responsible for abiding by Con Edison's EEO Policy and its Policy on Sexual Harassment. (Pierre Decl., Ex. B at GRIMES-

JENKINS 001051, Ex. D at GRIMES-JENKINS 001037.) Con Edison's EEO Policy and
its Policy on Sexual Harassment are available electronically. (Pierre Decl., Ex. B at
GRIMES-JENKINS 001048, Ex. D at GRIMES-JENKINS 001034.) Grimes-Jenkins
received copies of the Con Edison's EEO Policy and its Policy on Sexual Harassment
during her employment with Con Edison, and she understood both policies. (Grimes-
Jenkins Dep. 101:23-103:2, 105:10-106:8, 107:25-108:19.).

**RESPONSE:** Admit but only to the extent that there were stated polices but without admission
that such polices were followed, nor that any violations were ever punished.

13.    Con Edison trains all employees on EEO Policy and its Policy on Sexual Harassment,
regarding, among other things, discrimination because of gender or race, harassment,
retaliation, and employee complaints. (Karakatsanis Decl. ¶ 10.) Grimes-Jenkins
participated in training on Con Edison EEO Policy and its Policy on Sexual Harassment
on or about July 2016 prior to her termination on July 13, 2017. (Karakatsanis Decl., Ex.
B.) Con Edison's management team at the Manhattan Substations likewise participated in
training as to Con Edison's EEO Policy and its Policy on Sexual Harassment. (Karakatsanis
Decl. ¶ 11, Ex. B.).

**RESPONSE:** Admit but only to the extent that there were stated polices but without admission
that such polices were followed, nor that any violations were ever punished.

### III. GRIMES-JENKINS'S EMPLOYMENT WITH CON EDISON

*A. Grimes-Jenkins's Positions and Education with Con Edison and Alternate Employment*

14.    Grimes-Jenkins began her career with Con Edison as a cooperative student, where she was
trained in skills that she would use as a future Con Edison employee. (Grimes-Jenkins Dep.
47:2-48:10.) Con Edison recognized this effort, and gave Grimes-Jenkins the Cooperative

6

Award for successfully completing the cooperative program. (Grimes-Jenkins Dep. 34:9-21.).

**RESPONSE:** Admit.

15.   Following her participation in the cooperative program, Grimes-Jenkins began her employment with Con Edison on October 1, 1990 as a General Utility Worker, a union position with Local 1-2. (Grimes-Jenkins Dep. 48:11-49:2.).

**RESPONSE:** Admit.

16.   During her employment with Con Edison, Con Edison repeatedly promoted Grimes-Jenkins. (Grimes-Jenkins Dep. 49:8-21; 58:12-22; 59:24-60:14.) Grimes-Jenkins received a promotion from General Unity Worker to Mechanic B, a union position with Local 1-2, on August 20, 1995. (Grimes-Jenkins Dep. 49:8-21) Con Edison then promoted her from Mechanic B to Mechanic A, a union position with Local 1-2, on July 14, 2002. (Grimes-Jenkins Dep. 49:8-21, 57:8-20.).

**RESPONSE:** Admit.

17.   On February 1, 2006, Con Edison promoted Grimes-Jenkins from Mechanic A to Associate Specialist within the Government Relations Department, Public Affairs for Manhattan, which was a management position. (Grimes-Jenkins Dep. 60:5-14, 61:10-25, 63:12-18.) Grimes-Jenkins also received a promotion to Associate Specialist as part of the TEAM Program. (Grimes-Jenkins Dep. 60:22-61:13.) The TEAM Program is a program designed to promote union employees from union position to management roles within Con Edison. (Grimes-Jenkins Dep. 60:22-61:13.).

**RESPONSE:** Admit.

18.     On February 1, 2008, Grimes-Jenkins was demoted from Associate Specialist to Mechanic

        A, a union position with Local 1-2, the role she held prior to her promotion to Associate

        Specialist, because she was unable to successfully complete the Team Program. (Grimes-

        Jenkins Dep. 61:10-25, 63:23-64:4, 65:23-66:15.).

**RESPONSE:** Denies. While ConEd alleges the basis for he demotion to be founded in their own

        question, such is not accurate, as demonstrated by the questions and answers:

        What were you told when you were demoted? With the Answer being "That I wasn't

        suitable to do the job".

        (Grimes dep dated April 24, 2019 64:22-25, 65:2-18). (The subject deposition of

        Grimes dated April 24, 2019 is hereinafter designated "Grimes", and this portion

        of the testimony is annexed as **EXHIBIT "B"**).

        This dialogue continued in the Grimes deposition on page 65 through lines 2 - 15,

        (Grimes **EXHIBIT "B"**) wherein Sherry Grimes stated she was given no support

        in the job, not, as characterized by the Defendant, that she was demoted because

        she was unable to complete the Team Program.

19.     During her employment with Con Edison, Grimes-Jenkins received a Bachelor of Science

        in Organizational Management from Mercy College in or around 2007. (Grimes-Jenkins

        Dep. 30:19-24; Pierre Decl. Ex. C.) Con Edison financially supported Grimes-Jenkins's

        attainment of an undergraduate college degree during her employment through its Tuition

        Reimbursement Program. (Grimes-Jenkins Dep. 30:19-31:11.).

**RESPONSE:** Admit.

20.     Since 1990, and during her full time employment with Con Edison, Grimes-Jenkins owned

        and operated a floral design business named "Exclusively Mine and Yours Flowers" or

8

"EMY Flowers." (Grimes-Jenkins Dep. 37:14-38:5.) At times, Grimes-Jenkins has employed up to three employees through EMY Flowers and she once operated a store front location in the Bronx, New York. (Grimes-Jenkins Dep. 38:6-39:14.) Grimes-Jenkins continues to operate EMY Flowers following the termination of her employment with Con Edison. (Grimes-Jenkins Dep. 39:21-41:2.).

**RESPONSE:** Admit.

### B. Grimes-Jenkins's Supervision at the Manhattan Substations

21.    From February 2008 to January 2012, Grimes-Jenkins reported to Darlene Wells, an African-American woman. (Grimes-Jenkins Dep. 86:3-20; Roett Decl. Ex. A.) During the time Grimes-Jenkins reported to Wells, she consistently received satisfactory Performance Reviews from Wells. (Pierre Decl. Ex. K.) Wells was also a past customer for EMY Flowers. (Grimes-Jenkins Dep. 41:18-20.).

**RESPONSE:** Admit.

22.    From January 2012 until April 2017, Grimes-Jenkins reported directly to Nolan at the Manhattan Substations, ECB Section. (Grimes-Jenkins Dep. 99:16-21.) From May 2012 to July 1, 2018, Galloza was Grimes-Jenkins's second level manager, at the Manhattan Substations, ECB Section. (Grimes-Jenkins Dep. 86:15-20.).

**RESPONSE:** Admit.

23.    After her demotion from Associate Specialist to Mechanic A in 2008, General Manager Gavioli assigned Grimes-Jenkins to an office position at the Manhattan Substations, ECB Section, and as a result, Grimes-Jenkins spent her entire shift working in an office and not in the field preforming strenuous work similar to other Mechanics. (Grimes-Jenkins Dep. 63:23-64:4, 86:15-20, 295:21-296:4; Karakatsanis Decl. ¶ 7.) Her title as a Mechanic A

9

remained the same even though she did not perform work in the field like other Mechanics because she was preforming only administrative work while in an office role. (Karakatsanis Decl. ¶ 7; Grimes-Jenkins Dep. 66:3-14, 295:21-296:4.).

**RESPONSE:** Admit.

## IV. CON EDISON'S INVESTIGATES GRIMES-JENKINS'S COMPLAINTS

### A. Con Edison Investigates Complaints from Tybrey Barnes and Grimes- Jenkins

#### *i. Barnes Complains that Grimes-Jenkins Mocked his Disability*

24.     On July 25, 2013, Tybrey Barnes ("Barnes"), an African American male and a Supervisor at the Manhattan Substations, West 42nd Street location made a complaint against Grimes-Jenkins, which he reported to Howard Sheard ("Sheard"), an Area Manager, and Victor Faster ("Faster"), an Area Manager. (Grimes-Jenkins Dep. 114:21-115:6; Flynn Decl. Ex. A.).

**RESPONSE:** Admit to the extent of the report being made without admission as to the veracity of the underlying claims.

25.     Barnes alleged that on July 22, 2013, following a job-briefing meeting led by Barnes, Mechanics had witnessed Grimes-Jenkins mocking Barnes's speech impediment (stuttering) within the Manhattan Substations' parking lot and lunchroom. (Grimes-Jenkins Dep. 116:9-24; Flynn Decl. Ex. A.) The Mechanics were concerned and informed Barnes of Grimes- Jenkins's behavior on July 23, 2013. (Flynn Decl. Ex. A.) Because of Grimes-Jenkins behavior, Barnes was no longer comfortable working alongside Grimes-Jenkins, as he considered her behavior hurtful. (Flynn Decl. Ex. A.).

**RESPONSE:** Objection as to statements by Flynn as to what Barnes felt and any alleged

"concerns" of the Mechanics. Without waiver of the Objection, the claims are

Denied. The specific testimony of Grimes is

> Q. Were you present in the parking lot when people were talking about his speech impediment?
>
> A. I was present in the parking lot, but no one was talking about his speech impediment.
>
> Q. Who else was present in the parking lot with you?
>
> A. Devri Gibbs.
>
> Q. And this was in July 2013?
>
> A. Correct.
>
> Q. Was anybody else present?
>
> A. No.
>
> Q. How did you first learn that Mr. Barnes had made a complaint about you making fun of his stuttering?
>
> A. I had to speak to Mr. Barnes about the comments him and Devri Gibbs was making about my butt and the sexual harassment that was happening with Ms. Gibbs. A lot of mechanics came to me and told me they weren't comfortable with it either, and it was in July that I got called into the office by Eric Galloza.

(See Grimes Dep 116:13-25, 117:1-10 annexed hereto **EXHIBIT "C"**).

26.     Barnes was not Grimes-Jenkins's direct supervisor at the Manhattan Substations; but

rather, Grimes-Jenkins reported directly to Nolan. (Grimes-Jenkins Dep. 114:21-115:6.).

**RESPONSE:** Admit.

27.     On July 26, 2013, upon receiving the complaint, Galloza conducted a conflict resolution

meeting with Barnes and Grimes-Jenkins to resolve the complaint raised by Barnes.

(Grimes-Jenkins Dep. 116:25-117:23; Flynn Decl. ¶¶ 5-6, Ex. B.) During this meeting, Grimes-Jenkins apologized for comments she made concerning Barnes's speech impediment, as she did not intend offend Barnes. (Grimes-Jenkins Dep. 119:6-121:2; Flynn Decl. Exs. B-D.).

**RESPONSE:** Denies, to the extent that Grimes apologized if anything she said was "hurtful" (see Grimes 120:24-25 to 121:2) but this complaint as to the alleged comments were only after she complained about the participation of Barnes as to sexual harassment against Grimes (116:4-22) and she is clear she was "falsely accused". (See Grimes as annexed, **EXHIBIT "D"**).

28.   Nonetheless, Grimes-Jenkins attempted to minimize her comments regarding Barnes's speech impediment by claiming that Barnes had made past comments concerning her rear-end, which she did not previously report to Galloza or Human Resources. (Flynn Decl. Exs. C-D.) Barnes denied making any comments regarding Grimes-Jenkins's rear-end. (Flynn Decl. Ex. C.).

**RESPONSE:** Objection to the term that ".... Grimes-Jenkins attempted to minimize her comments ...." in that this is a Statement of Facts, not rhetoric. Additionally, a point of dispute has been and remains what, if any action was taken in response to various reports made by the Plaintiff, and whether the Defendant ConEd fostered an environment to encourage reporting, or discourage reporting for that matter.

29.   At the conclusion of the meeting, Barnes and Grimes-Jenkins shook hands and the dispute appeared resolved, and thus was not reported to ODI for further action. (Flynn Decl. Ex. B.).

**RESPONSE:** Admit.

### ii. Grimes-Jenkins's Reports Pest Issue to Managers and Barnes, and Prevents Barnes from Addressing Her Concerns

30.    Over two months later, on September 17, 2013, Grimes-Jenkins reported via email to Nolan, Barnes, and Rodney Mullings, A Field Operations Planner, that there were insects and/or droppings by her workstation at the Manhattan Substations, West 42nd Street location. (Grimes-Jenkins Dep. 143:18-145:6; Pierre Decl. Ex. E.) Nolan responded immediately to Grimes-Jenkins's report and advised her that he would have her workstation cleaned. (Grimes-Jenkins Dep. 143:18-145:12; Pierre Decl. Ex. E.).

**RESPONSE:** Admit.

31.    Grimes-Jenkins then verbally reported the issue to Barnes. (Grimes-Jenkins Dep. 145:13-24.) Barnes then spoke to Galloza, Cory Jaworksy, Walter Lyons, and Sean Mahoney about how best to address the issue identified by Grimes-Jenkins. (Flynn Decl. Ex. E.) Barnes also contacted a janitor to clean up the area identified by Grimes-Jenkins. (Grimes-Jenkins Dep. 145:13-146:12.).

**RESPONSE:** Objection as to the claims of discussions and actions, but more importantly and without waiver of the Objection omitted is the actual response as detailed in the questions following below.

32.    When the janitor arrived, however, Grimes-Jenkins did not believe it was appropriate to have the janitor clean the area and believed that Barnes was ignoring her concerns. (Grimes-Jenkins Dep. 145:13-147:2. Without confirming, Grimes-Jenkins believed that Barnes had not conferred with any managers regarding how to address her report. (Grimes-Jenkins Dep. 148:22-149:21; Flynn Decl. Exs. D-E.) As a result, Grimes-Jenkins called a

13

"Timeout" to stop the Barnes's cleanup efforts, and she then walked away from Barnes. (Grimes-Jenkins Dep. 145:13-147:2.).

**RESPONSE:** Denied including Grimes' statement that "I called a timeout, because now he moved and he said for the janitor to clean up. There's policies and procedures for, when you have this kind of stuff happening, you have to call and get it assessed by a contractor". (Grimes 146:8-12 **EXHIBIT E** and also see Grimes at 145:11-22 also **EXHIBIT E**), the testimony also being reproduced verbatim below as follows:

Q.  Is that right?

A.  Yes. Okay. And then you send an e-mail back to Thomas Nolan two minutes later, and that's where you complain that Mr. Barnes didn't move to take a look at it?

A.  **He didn't want to hear from me. He told me, he said, who the fuck are you talking to**? And he didn't want to hear from me, and what he did was he turned his back from me and he walked out. [**Emphasis added**].

(See Grimes as annexed, **EXHIBIT "E"**).

33.  Calling a "Timeout" is a safety mechanism, which ceases all work at a particular worksite so that employees can immediately address a safety concern. (Grimes-Jenkins Dep.148:7-21.) Employees are not permitted to call a "Timeout" simply because they disagree with their supervisor instruction. (Grimes-Jenkins Dep. 146:13-148:6.).

**RESPONSE:** Admit.

34.  Based on Grimes-Jenkins September 17, 2013 report, Con Edison initiated an immediate cleanup of Grimes-Jenkins's workstation, and she was transferred her to the Astor Place location of the Manhattan Substations while an exterminator addressed the issues she reported.(Grimes-Jenkins Dep. 151:19-152:9; 250:7-23; 252:3-253-7.).

**RESPONSE:** Denied. What was testified to is discussed below but as detailed Grimes stated that

she stated that an outside contractor was required to be called by ConEd rules. (See

Grimes 146:13-25, 151:2-25, 152:2-22, 250:16-25, 251:2-25, 252:2-25, 253:2-23

as annexed, **EXHIBIT "F"**).

   *iii. Con Edison Conducts Fact Finding Interviews after Interaction between Barnes and Grimes-Jenkins on September 17, 2013*

35.   On September 19, 2019, Faster and Tracy Lin, a Senior Labor Relations Manager,

conducted a fact-finding interview with Barnes regarding his interactions with Grimes-

Jenkins on September 17, 2013. (Flynn Decl. Exs. C, E.) During the fact-finding interview,

Barnes informed Lin that he had complained on July 25, 2013 that Grimes-Jenkins had

mocked his speech impediment in front of other mechanics. (Flynn Decl. Exs. C, E.) Barnes

also informed Lin that he and Grimes-Jenkins had met with Galloza on July 26, 2013 to

resolve his complaint. (Flynn Decl. Exs. C, E.) After the meeting, however, Grimes-Jenkins

questioned other mechanics at the Manhattan Substations to determine who told Barnes

about her comments. (Flynn Decl. Exs. C, E.) Barnes also alleged that Grimes-Jenkins told

Nolan that she could no longer speak freely within the office because Barnes was present.

(Flynn Decl. Exs. C, E.) Barnes also alleged that Grimes-Jenkins referred to him as

"insecure" because, at times, he reminds personnel that he is a Supervisor. (Flynn Decl.

Exs. C, E.) Barnes also alleged that Grimes-Jenkins had informed other Mechanics that he

was "going after her." (Flynn Decl. Exs. C, E.) He also alleged that Grimes-Jenkins was

spreading rumors that Barnes was related to Wells, which he is not. (Flynn Decl. Exs. C,

E.) All told, Grimes-Jenkins's behavior made Barnes feel uncomfortable in the workplace.

(Flynn Decl. Exs. C, E.).

**RESPONSE:** Denies to the extent of the allegations and statements purportedly made by other

individuals.

36.     On September 20, 2019, Lin, Nolan, Galloza, and Andrew Broadnax, a union

representative, conducted a fact-finding interview with Grimes-Jenkins regarding her

interactions with Barnes and her September 17, 2013 report. (Grimes-Jenkins Dep. 152:10-

153:9.) While she acknowledged conducting a conflict resolution meeting on July 26, 2013

with Barnes and Galloza, Grimes-Jenkins was evasive when asked whether she apologized

for mocking Barnes's speech impediment. (Flynn Decl. Ex. D.) Instead, she admitted that

she apologized for making comments that offended Barnes. (Flynn Decl. Ex. D.) She

admitted, however, to making comments regarding Barnes's speech impediment and

purported past jokes by Rodney Bruff to Devri Gibbs ("Gibbs") and Lisa Johnson, two

other Mechanics at the Manhattan Substations. (Flynn Decl. Ex. D.) Grimes-Jenkins also

admitted to questioning four Mechanics and former Shop Steward concerning Barnes's

complaint to determine who had reported her comments to Barnes. (Flynn Decl. Ex. D.)

Grimes-Jenkins also admitted to telling others that she believed that Barnes and Wells were

related, based only on second hand accounts. (Flynn Decl. Ex. D.) Grimes-Jenkins also

admitted to informing other employees that Barnes was "out to get her." (Flynn Decl. Ex.

D.).

**RESPONSE:** Objection: The characterization of "evasive" is baseless and not the proper subject

of a Statement of Facts. Additionally, the Plaintiff denies the statements including

as to claims of relevancy, as recited by the Defendant, in which the Defendant

alleges the Plaintiff made various statements as to other individuals.

16

Notably, the comment of the Defendant uses the word "ass" (see above) and hence they admit some of Plaintiff's issues.

37. During her fact-finding interview, Grimes-Jenkins also made a number of allegations concerning Barnes and Gibbs, which she did not previously report to ODI. (Flynn Decl. Ex. D.) First, Grimes-Jenkins alleged that Gibbs pretended to pinch and grab her rear-end in or around 2011. (Flynn Decl. Ex. D.) Second, in early 2012, Grimes-Jenkins alleged that, as she walked by Gibbs and Barnes, Gibbs stated to Barnes that "you want to fuck that don't you" or "you want that, don't you," in alleged reference to Grimes-Jenkins. (Flynn Decl. Ex. D.) In response, Grimes-Jenkins alleged that Barnes stated, "not everyone is into that." Flynn Decl. Ex. D.) Third, Grimes-Jenkins alleged that, while she was getting dressed for a co-worker's retirement party, in or around June 2013, Gibbs asked her to "bring that ass out here" and otherwise made inappropriate comments concerning her appearance, and that Barnes laughed at the comments. (Flynn Decl. Ex. D.).

**RESPONSE:** Objection - denied as to claims that Grimes failed to report various incidents and claims of statements which were allegedly made by other individuals and noting that Plaintiff was from time to time fearful of filing reports as there was an undercurrent of secrecy and discouraging reporting of violations.

38. Grimes-Jenkins admits that Barnes did not make any comments concerning her rear end; but merely believed that he was present for comments she attributed to Gibbs. (Grimes-Jenkins Dep. 158:3-22.).

**RESPONSE:** Objection - denies. The transcript specifically states what Grimes understood was said at a given time including that she used the word "constantly" (Grimes 158:21-

22) and the fact she complained of such. (Grimes 158:23-25). (See Grimes as annexed, **EXHIBIT "G"**).

39. Grimes-Jenkins did not allege that the actions of Barnes and Gibbs were motivated by race of gender discrimination. (Flynn Decl. Ex. D.)

**RESPONSE:** Objection denied noting that this statement is based upon the statements allegedly made by other individuals.

40. Grimes-Jenkins believes that her relationship with Barnes deteriorated, not due to race or gender, but rather, because Barnes was upset by a critical comment she had made regarding the paint color of the Manhattan Substations, which he had selected. (Grimes-Jenkins Dep. 160:8-163:22; Flynn Decl. Ex. D.).

**RESPONSE:** Objection as a mis-characterization of the deposition testimony including most specifically as to the color, in which was stated:

> Q.  Do you believe that Mr. Barnes perceived your comments as critical of him?
>
> A.  I don't know what he believed, because, you know, why me and not the other guy who agreed that the room was ugly and he didn't like the color either? Why Sherry?
>
> Q.  Do you know who told him that you said that the room was ugly after he painted it?
>
> A.  Oh, yes.

(See Grimes 162:4-12 as annexed, **EXHIBIT "H"**).

*iv. Con Edison Investigates Complaints by Barnes and Grimes-Jenkins*

41. Based on the fact-finding interviews conducted with Barnes and Grimes-Jenkins, Con Edison immediately opened investigations as to both complaints and the associated allegations. (Grimes-Jenkins Dep. 178:20-22, 183:11-22; Flynn Decl. ¶ 3.).

**RESPONSE:** Objection, denies as a mischaracterization of the testimony but admits an EEOC investigation was opened.   (See Grimes 178:6-25, 182:4-25, 183:2-25 and especially page 183, line 11-25 as annexed, **EXHIBIT "I"**).  Page 183, lines 11 through 25 read as follows:

Q.    And you said Ms. Flynn investigated the concerns that you were raising here; is that right?

A    I don't think she did.

Q.    Was she investigating something?

A    The Tye Barnes situation.

Q.    When you say "the Tye Barnes situation," what do you mean?

A    After they met with Tracy Lin, I was called in by the EEO that they were investigating this -- the alleged statement that I made.

Q.    Did the company also investigate your claims of retaliation?

A    No, they did not.

42.    Jennifer Flynn, Specialist and Investigator with ODI, investigated and conducted a follow up interview with Grimes-Jenkins on September 26, 2013, where Grimes-Jenkins further alleged that Barnes once stated to her "you're a Rastafarian, you must smoke weed. Everyone I know who is does;" and further alleged that Barnes once stated to her, "all women from Barbados are bourgie." (Flynn Decl. Ex. F.) While it was not raised in the fact-finding interview, Grimes-Jenkins later alleged that at an unspecified time, after falling off her chair, Gibbs stated that Grimes-Jenkins's "big ass" "bounced" off the floor to the ceiling, and that she witnessed Barnes laughing at this comment. (Grimes-Jenkins Dep. 157:10-158:6; Flynn Decl. Ex. F.).

**RESPONSE:** Admit though subject to the actual testimony.

43.   On October 23, 2013, Grimes-Jenkins contacted Flynn to allege that she was being
retaliated against following her September 17, 2013 report. (Grimes-Jenkins Dep. 171:7-
172:3; Pierre Decl. Ex. F.) In particular, Nolan instructed Grimes-Jenkins and Steve
Engelhardt, a male Mechanic, that they both had to abide by the policy for proper attire
when working within the Manhattan Substations's office. (Grimes-Jenkins Dep. 171:7-
174:6; Pierre Decl. Ex. F.) Nolan specified that sneakers, sandals, open toed shoes, and
dresses were inappropriate at the Manhattan Substations. (Pierre Decl. Ex. F.) In her report
to Flynn, Grimes-Jenkins did not allege that Nolan instructed her not wear "girly stuff."
(Grimes-Jenkins Dep. 181:3-183:10.).

**RESPONSE:** Admit, noting however that the deposition is clear that Grimes was not sure of
exactly what words were used including as to the phrase "girly -stuff". (See Grimes
181: 19-25, 182: 2-16 as annexed, **EXHIBIT "J"**).

44.   Following Grimes-Jenkins report, Flynn conducted a follow up interview with Grimes-
Jenkins on November 6, 2013 regarding her retaliation allegations following the September
17, 2013 report. (Flynn Decl. Ex. G.) Grimes-Jenkins was unsure what motivated the
alleged retaliation, and believed that it was associated with her September 17, 2013 Report.
(Flynn Decl. Ex. G.) Grimes-Jenkins did not request a transfer at the meeting. (Flynn Decl.
Ex. F.) She did not allege that the actions were motivated by race or gender discrimination.
(Flynn Decl. Ex. F-G.).

**RESPONSE:** Admit as to Grimes' statements and subject to the actual testimony and transcript,
and deny claims as to what other persons allegedly said.

45.   On November 20, 2013, Con Edison concluded its investigation of Barnes's complaint and
determined that his complaint against Grimes-Jenkins was substantiated and that Grimes-

Jenkins had violated Con Edison's EEO Policy and its Standard of Business Conduct. (Flynn Decl. Ex. H.) In particular, witnesses had corroborated that Grimes-Jenkins had mocked Barnes's speech impediment by impersonating him before other Mechanics and had later laughed about her impersonation around other Mechanics in the Manhattan Substations lunchroom. (Flynn Decl. Ex. H.) Witnesses and Grimes-Jenkins, herself, corroborated that she had questioned other Mechanics to determine who informed Barnes of her comments and behavior following his internal complaint. (Flynn Decl. Ex. H.) Con Edison reasonably believes that this behavior inhibits others' willingness to report possible EEO Policy violations. (Flynn Decl. Ex. H.).

**RESPONSE:** Admit to the extent of ConEd's actions without admission as to the underlying veracity thereof, denies knowledge or information sufficient to form a belief as to what ConEd "reasonably believes".

46.    It was also reported during the investigation that other employees were fearful of Grimes-Jenkins because they perceived that she used the EEO complaint procedure as a threat, and as a result, Grimes-Jenkins made the working environment uncomfortable and made employees feel uneasy. (Flynn Decl. Ex. H.).

**RESPONSE:** Denies knowledge or information sufficient to form a belief as to what is claimed other employees felt.

47.    Grimes-Jenkins was not present during the witness interviews associated with the investigation. (Grimes-Jenkins Dep. 187:12-14.) She also does not know what documents were reviewed as part of the investigation. (Grimes-Jenkins Dep. 187:15-18.) She also does not have personal, firsthand knowledge as to who made the findings and conclusions

21

reported by EEOA. (Grimes-Jenkins Dep. 187:19-188:23.) Grimes-Jenkins was not provided a copy of the investigation findings. (Grimes-Jenkins Dep. 189:25-190:6.).

**RESPONSE:** Admit.

48.     On November 21, 2013, Con Edison concluded its investigation of Grimes-Jenkins's complaint against Barnes and Gibbs, and determined that her complaint was unsubstantiated and that neither Barnes nor Gibbs violated Con Edison's EEO Policy. (Flynn Decl. Ex. I.) In particular, no witnesses could corroborate that Gibbs made the comments attributed to her by Grimes-Jenkins. (Flynn Decl. Ex. I.) No witness could corroborate that Barnes was present for any comments attributed to Gibbs by Grimes-Jenkins as well. (Flynn Decl. Ex. I.) Additionally, no witness could corroborate whether Barnes had made any inappropriate comments regarding Rastafarianism or women from Barbados. (Flynn Decl. Ex. I.).

**RESPONSE:** Admit to the extent that ConEd alleges the statements to represent the findings without admission to the underlying facts.

49.     Lastly, Con Edison could not substantiate Grimes-Jenkins's retaliation allegations. (Flynn Decl. Ex. I.) While Con Edison found other employees were concerned about her prior conduct relating to EEOA investigations, it did not find sufficient evidence linking Grimes-Jenkins's complaint against Barnes and Gibbs with the misconduct she reported (Flynn Decl. Ex. I). Grimes-Jenkins herself stated that the conduct of which she complains was related to her September 17, 2013 Report and not a complaint of discrimination. (Flynn Decl. Ex. I.) Con Edison also determined that Grimes-Jenkins had received more favorable treatment than her peers had, in that she was excused from customary attire standards and

job assignments (*i.e.*, she was given an office role and was previously excused from the proper attire policy). (Flynn Decl. Ex. I; (Karakatsanis Decl. ¶ 7.).

**RESPONSE:** Admit to the extent that ConEd alleges the statements to represent the findings without admission to the underlying facts.

### *v. Grimes-Jenkins's Receives Written Warning for Violation of ConEdison's EEO Policy and Its Standards of Business Conduct*

50.    On January 7, 2014, Nolan issued Grimes-Jenkins an Employee Interview (No. 145329) for a Final Warning and five-day unpaid suspension for violating Con Edison's Equal Employment Opportunity Policy and its Standards of Business Conduct. (Grimes-Jenkins Dep. 190:16-24, 193:9-22, 198:8-18; Pierre Decl. Ex. G.) Galloza, Lin, and Thomas McEnery ("McEnery"), a Shop Steward, were present as witnesses. (Grimes-Jenkins Dep. 193:9-22, 198:8-18; Pierre Decl. Ex. G.) Grimes-Jenkins was reminded to adhere to the Company's policies and refrain from inappropriate behavior and/or policy violations. (Pierre Decl. Ex. G.) She was advised that further violations would result in progressive disciplinary action, including termination of employment. (Pierre Decl. Ex. G.) Grimes-Jenkins was to report back to work on January 13, 2014 following her suspension. (Pierre Decl. Ex. G.).

**RESPONSE:** Admit, without admission as to any underlying claims and contentions as to the issuance of a warning but denies statements claimed to have been made by other individuals and specifically note the Defendant's contentions as to Plaintiffs Deposition testimony is unsupported.

Q.   Is that what led the business agent to talk to you about a reduced penalty?

23

A. The business agent, after speaking to -- I'll tell you what happened. After speaking to Jerry Husbands and learning something, he said to me -- was it around that time? He said to me he didn't understand why he said he didn't understand why they gave me a week suspension, final warning when he threatened to shoot somebody and he only got a day, and I got a week -- a week, final warning -- a week and a final warning for smirking, and he didn't understand how -- he said, you know, you got to hire a lawyer or do something, because they're coming after you. Right?

Q. Who said?

A. Jerry Husbands. Because he got -- he got into -- the same clique of people made an accusation against him, and he said he got a day suspension for threatening to shoot --them alleging that he threatened to shoot on of them, and I got a week and a final warning, you know, for – for making a smirk. He said he didn't understand how that happened. He said, they're coming to get you. And –

(See Grimes Dep 191: 6-25, 192:2-5 as annexed, **EXHIBIT "K"**).

A. I got a call from 42nd Street: They're going to hit you hard.

Q. Who said "they" are going to hit you hard?

A. It was the operator.

Q. Who was the operator?

A. The operator was the same guy that was in the room with the paint. The tall guy. I forgot his name.

Q. You have mentioned a group of people a few times that you have called the clique. I just want to make sure I'm understanding who's in the clique.

Q. Who are the members of that clique?

A. So when I turned in the situation with Darlene, Avery Ez [phonetic], who was co-chairman, came down and said, Sherry, I'm going to tell you one thing right now. You better watch your back.

Q. Okay. Just my question is who's in the clique?

(See Grimes Dep 194: 3-23 as annexed, **EXHIBIT "K"**).

A. He also urged me to take the lesser agreement and -- my managers did. My supervisor, Nolan and them, said I should take the lesser agreement because I have

24

young kids, and if I'm late one day, if I go out sick or something, I can lose my job.
So ...
(Witness begins to cry.)

MS. KLEIN: Do you need a minute? Do you need a tissue?

THE WITNESS: I had to take a lesser agreement and not fight for -- or try to fight
on the lie that was being told because of my family and the fact that -- and no matter
how I fight and told them I didn't do this, I just had to take the lesser agreement that
was there. I couldn't -- there was no way I could prove or win or show that I didn't
do this.

(See Grimes Dep 199: 4-21 as annexed, **EXHIBIT "K"**).

51.     Grimes-Jenkins was given an opportunity to offer an employee statement, and she did not

        claim that the Employee Interview was motivated by race or gender discrimination or

        retaliation. (Pierre Decl. Ex. G.).

**RESPONSE:** Admit.

52.     On January 17, 2014, Grimes-Jenkins filed a union grievance as to her Employee Interview

        (No. 145329). (Grimes-Jenkins Dep. 198:8-20, 200:6-202:8; Pierre Decl. Ex. H.) As part

        of her grievance, Grimes-Jenkins requested, among other things, removal of the January 7,

        2014 Final Warning and five-day unpaid suspension as well as a transfer to another

        unspecified location. (Pierre Decl. Ex. H.).

**RESPONSE:** Admit.

53.     On March 5, 2014, Con Edison, the Union, and Grimes-Jenkins executed a settlement

        agreement resolving Grimes-Jenkins's grievance. (Grimes-Jenkins Dep. 206:18-207:7;

        Pierre Decl. Ex. I.) As part of the settlement, Con Edison reduced Grimes-Jenkins's

        January 7, 2014 Employee Interview (No. 145329) from Final Warning and five-day

        unpaid suspension to a Written Warning and a four-day unpaid suspension. (Pierre Decl.

        Ex. I.) Grimes-Jenkins was also awarded eight hours of straight time pay based on the

rescinded suspension day (*i.e.*, eight hours). (Pierre Decl. Ex. I.) Grimes-Jenkins voluntarily entered into the settlement agreement with the Union and Con Edison. (Pierre Decl. Ex. I.).

**RESPONSE:** Admit.

**B. Con Edison Investigates Grimes-Jenkins's April 20, 2015 Complaints to Local Management and the Ombudsman**

54.    On April 20, 2015, Galloza, Nolan, and Peter Jacoviello ("Jacoviello"), a Shop Steward, held a fact-finding interview with Grimes-Jenkins's to discuss interactions she had with David Robinson, an Operations Trainer, Robin Yang, an African American woman and a Mechanic A, Barnes, and Louise Baker, an African American woman and a Supervisor (all located at Astor Place), which she found to be hostile or otherwise inappropriate between March 31, 2015 and April 20, 2015. (Grimes-Jenkins Dep. 207:22-208:14; Nolan Decl. ¶¶ 6-7, Ex. B.).

**RESPONSE:** Admit.

55.    On April 20, 2015, Grimes-Jenkins also contacted Con Edison's Office of the Ombudsman via its Hotline, and requested in-person interview to discuss her concerns. (Grimes-Jenkins Dep. 207:8-21; Foley Decl. ¶ 4.) Jessica Robles-Maisonet, Senior Specialist, in the office of the Ombudsman Office, then conducted a fact-finding interview on April 24, 2015. (Foley Decl. ¶ 4.).

**RESPONSE:** Admit.

   *i. Con Edison's Employee & Labor Relations Department Investigates Claims against Robinson and Yang*

56.    In her April 20, 2015 complaint, Grimes-Jenkins alleged three discourteous interactions related to Robinson and Yang in April 2015, which was investigated by Con Edison's

Employee & Labor Relations Department. (Caraballo Decl. ¶ 5, Ex. A.) Johanna Caraballo ("Caraballo") conducted the investigation on behalf of the Employee & Labor Relations Department. (Caraballo Decl. ¶ 3.).

**RESPONSE:** Admit.

57.     First, Grimes-Jenkins alleged that she overheard a conversation between Robinson and other Mechanics where Robinson stated, "A Mechanics with A Mechanic titles should be doing A Mechanic work and should not be sitting in an office." (Grimes-Jenkins Dep. 224:13-225:11; Caraballo Decl. Ex. A.) Grimes-Jenkins alleged that this comment was directed towards her, as she was the only Mechanic A in the administrative office at Astor Place. (Grimes-Jenkins Dep. 224:13-225:11; Caraballo Decl. Ex. A.).

**RESPONSE:** Admit.

58.     Second, Grimes-Jenkins alleged that Robinson had insinuated that she was fat. (Grimes-Jenkins Dep. 220:17-222:3.) More specifically, Grimes-Jenkins alleged that she printed some materials and Robinson attempted to bring her materials to her from the printer and made an unspecified comment and that in response, she asked, "[w]hat, are you calling me fat?" (Grimes- Jenkins Dep. 220:17-222:3.) Grimes-Jenkins further alleged that after his comment, Yang warned Robinson that Grimes-Jenkins would report his response to EEOA for investigation. (Grimes-Jenkins Dep. 221:19-223:12.) While unsure, Grimes-Jenkins alleged that Robinson might have ultimately misinterpreted her response to his offer to pass her the printed materials. (Grimes-Jenkins Dep. 221:19-223:12.).

**RESPONSE:** Admit.

59.     Third, Grimes-Jenkins alleged that she overheard Robinson telling Yang, "you can't hide underneath the union. The union can't protect you. All you can do is call out sick, and

that's what you always do. You must be smoking weed. They talk about Bob Marley, don't know anything. I'm the real Buffalo Solider." (Grimes-Jenkins Dep. 219:13-21; 224:13-225:11; Caraballo Decl. Ex. A.) Grimes-Jenkins purportedly took offense to these comments because she believed that they were referring to her and her West Indian heritage. (Grimes-Jenkins Dep. 219:13-22; 224:13-225:11; Caraballo Decl. Ex. A.).

**RESPONSE:** Admit.

60.    On September 8, 2015, the Employee & Labor Relations Department concluded its investigation and determined that Grimes-Jenkins's allegations were unsubstantiated. (Caraballo Decl. ¶¶ 4-5, Ex. A.) As to the alleged Mechanic A comments, no witness could corroborate Grimes-Jenkins's allegation. (Caraballo Decl. Ex. A.) Robinson admitted that, as an Operations Trainer, he was interested in how Grimes-Jenkins worked in the administrative office rather than in the field given a Mechanic A's career path did not include administrative work, based on his work experience with Con Edison. (Caraballo Decl. Ex. A.) As to the printer allegation, no witnesses could corroborate Grimes-Jenkins's allegations and Robinson denied making any comment about Grimes-Jenkins's body or weight. (Caraballo Decl. Ex. A.) As to the alleged comments related to the Union, marijuana, and Bob Marley, no witnesses could corroborate Grimes-Jenkins's allegations. (Caraballo Decl. Ex. A.) Robinson did not recall the exchange described by Grimes-Jenkins and denied making the alleged comments about "weed," "Bob Marley," Buffalo Solder," but he did admit that he spoke with Grimes-Jenkins about a motorcycle club, of which he is a member, called "Buffalo Solider." (Caraballo Decl. Ex. A.).

**RESPONSE:** Admit as to the findings without admission otherwise.

*ii. Con Edison's Corporate Security Department Investigates Grimes-Jenkins's Allegations against Barnes and Baker*

61.     In addition to her allegations against Robinson and Yang on April 20, 2015, Grimes-Jenkins also alleged that she overheard a conversation between Barnes and Baker, where Barnes allegedly stated that he had a practice of purchasing "burner" or disposable phones to prank or "crank" call persons he does not like. (Grimes-Jenkins Dep. 215:17-216:20.) Grimes-Jenkins alleged that she had received crank calls following her September 17, 2013 report, which she attributed to Barnes. (Grimes-Jenkins Dep. 215:17-216:20; Cus Decl. ¶¶ 3-5, Ex. A.).

**RESPONSE:** Admit.

62.     The Ombudsman Office referred this allegation to the Corporate Security Department ("Corporate Security") for investigation. (Cus Decl. ¶ 3.) Stephanie Cus conducted the investigation on behalf of Corporate Security, which included interviews with both Barnes and Baker. (Cus Decl. ¶ 3, Ex. A.).

**RESPONSE:** Admit.

63.     On May 28, 2015, the Corporate Security concluded its investigation and determined that Grimes-Jenkins's allegations were unsubstantiated. (Grimes-Jenkins Dep. 217:4- 14; Cus Decl. ¶ 4, Ex. A.) Corporate Security determined that Barnes and Baker denied ever discussing the purchase of burner cell phones, but merely admitted to discussing their use of *Google Voice* while traveling. (Grimes-Jenkins Dep. 217:4-14; Cus Decl. Ex. A.) Both also denied making any crank calls to Grimes-Jenkins. (Cus Decl. Ex. A.) Grimes-Jenkins did not provide any further information supporting her allegations. (Cus Decl. Ex. A.)

Grimes-Jenkins was advised of Corporate Security investigation findings on or about May 28, 2015, and Grimes- Jenkins was satisfied with the outcome. (Cus Decl. Ex. A.).

**RESPONSE:** Admit to the extent of claims as to the findings.

*iii. Employee and Labor Relations, Ombudsman, and ODI Conducts Closeout Meeting with Grimes-Jenkins*

64.     On October 28, 2015, a joint closeout meeting was conducted with the Office of Diversity and Inclusion, Labor and Employee Relations, and the Ombudsman Office, which was attended by Caraballo. (Grimes-Jenkins Dep. 214:10-215:16; Caraballo Decl. ¶¶ 6-7, Ex. B.) During this meeting, Grimes-Jenkins was informed that Con Edison was unable to substantiate the allegations she raised. (Grimes-Jenkins Dep. 214:10-215:16; Caraballo Decl. Ex. B.).

**RESPONSE:** Admits.

65.     The remaining concerns raised in Grimes-Jenkins's April 20, 2015 complaint were referred to local management to address through Con Edison's conflict resolution process. (Foley Decl. ¶¶ 2-5.).

**RESPONSE:** Admits.

**C. Con Edison Investigates Grimes-Jenkins's April 20, 2016 Complaint**

66.     On April 20, 2016, Grimes-Jenkins complained via email to Gavioli that Yang and Stella Polanco, an African American female and Project Specialist, would follow her into the women's restroom and leave the entrance or external door to the restroom open while she was in the restroom. (Grimes-Jenkins Dep. 207:22-208:14; Nolan Decl. ¶¶ 8-9, Ex. C.) In particular, she alleged that Yang would to enter the restroom and would leave the entrance door open to access the lockers. (Nolan Decl. ¶¶ 8-9, Ex. C.) Grimes-Jenkins did not expect

her to stay out of the restroom while she was using it, but she merely wanted the entrance door closed. (Grimes-Jenkins Dep. 208:15-209:19.) Grimes-Jenkins alleged that after she asked Yang to leave the restroom entrance door closed, Yang "charged at" her and kicked nearby lockers in response. (Grimes-Jenkins Dep. 207:22-209:16, 209:20-210:11.) Yang did not touch or strike her during this encounter, as Grimes-Jenkins walked away. (Grimes-Jenkins Dep. 210:5-11.).

**RESPONSE:** Admits.

67.   Grimes-Jenkins did not believe that this encounter was motivated by race or gender discrimination; but rather, she believes that Yang's alleged actions were motivated by her alleged association with Wells. (Grimes-Jenkins Dep. 212:14-213:3.) Grimes-Jenkins does not know why Yang would have problems with her because of any concerns she raised regarding Wells. (Grimes-Jenkins Dep. 212:14-213:4.).

**RESPONSE:** Admits but only subject to the statements as made in the deposition.

68.   Grimes-Jenkins's complaint was reported to Human Resources, which commenced an investigation. (Nolan Decl. ¶ 10, Ex. D.) Tyrell conducted the investigation, which included interviews of Yang, Polanco, and Baker. (Nolan Decl. Ex. D.) All three denied the allegations made against them by Grimes-Jenkins. (Nolan Decl. Ex. D.).

**RESPONSE:** Admits.

69.   Grimes-Jenkins was informed of Human Recourses' findings during a meeting on May 5, 2016 with Tyrell. (Grimes-Jenkins Dep. 213:5-24; Nolan Decl. Ex. D.) Tyrell additionally recommended a conflict resolution meeting to resolve the differences between the implicated employees. (Nolan Decl. Ex. D.) Grimes-Jenkins declined to participate in a conflict resolution meeting, however. (Nolan Decl. Ex. D.).

31

**RESPONSE:** Admits.

### V. GRIMES-JENKINS'S TRANSFER REQUESTS

70.   To transfer locations within Con Edison, Union employees must engage with and receive
that approval of their union. (Grimes-Jenkins Dep. 261:8-20.) For instance, a Union
employee may transfer between locations if the union identifies another Union employee
that is willing to swap locations. (Grimes-Jenkins Dep. 262:9-12.) A Union employee may
also facilitate a transfer by applying for open positions in desired Con Edison location.
(Grimes-Jenkins Dep. 266:5-23.).

**RESPONSE:** Admits.

71.   On November 21, 2013, Grimes-Jenkins requested a transfer due to personal hardship.
(Grimes-Jenkins Dep. 256:15-257:16; Pierre Decl. Ex. J.) Grimes-Jenkins's hardship
request was given to Human Resources and Galloza for consideration. (Pierre Decl. Ex. J.)
Grimes-Jenkins's hardship transfer request did not specify her desired transfer location.
(Pierre Decl. Ex. J.) Grimes-Jenkins's hardship transfer request described her hardships
generally as "personal reasons, family obligations, and traveling difficulties." (Pierre Decl.
Ex. J.) Grimes- Jenkins did not include a union representative on her hardship transfer
request. (Pierre Decl. Ex. J.).

**RESPONSE:** Admits.

72.   The Department was unable to accommodate Grimes-Jenkins's transfer request at that time
as she did not have union approval and had not identified any union employee that would
consent to a swap with her request, and thus it was denied. (Grimes-Jenkins Dep. 257:14-
258:4.) Nolan and Galloza communicated the transfer decision to Grimes-Jenkins on
December 4, 2013 during a meeting. (Nolan Decl. ¶ 5, Ex. A.).

**RESPONSE:** Admits various transfer requests were all turned down without admission as to the

basis for the denial and without admission that she could not locate a union

employees who would consent to the requested swap in accord with the testimony

at page 263, lines 2-7 in which Grimes testified that she could find someone who

would swap with her, not with standing the statements of the Defendant herein and

above. The testimony is annexed hereto (see Grimes 263:2-7 as annexed hereto

**EXHIBIT "L"**) and is also set forth verbatim as follows though notably the specific

pages are not as referenced by the Defendants.

Q. Who agreed that they will swap with you?

A. Guy. He's a supervisor now, but Guy

Q. Guy what?

A. Jewel Guy said he wouldn't mind working in Manhattan. I think he's
there now.

(See Grimes Dep 263: 2-7 annexed hereto as **EXHIBIT "L"**.).

Q. Did you bring Mr. Guy's willingness to swap with you to the union's
attention?

A. I did. Omaira Sanchez, who lived in I think Brooklyn, whatever, got sent
to East River, didn't like her, so I asked her, you know, and I mentioned to
Eric, let Omaira come down and I will go up and do what Omaira is doing
in the office. We're both office people, and the response to the whole
department is, "I don't want this F-ing B here."

Q. Who said that?

A. Galloza and Nolan and the guys in the office.

Q. Did you hear Galloza say that -

A. Oh, yes.

Q.-- or someone else told you?

\

> A. Nobody told me. He was sitting in the office when I said it, that I would swap with her.

(See Grimes Dep 264: 2-18 annexed hereto as **EXHIBIT "L"**).

> Q. You could also have applied to open positions in the Bronxville or Westchester, if you wanted to, right?
>
> A. Oh, yes.
>
> Q. Did you apply to any positions in the Bronx or Westchester?
>
> A. I did.

(See Grimes Dep 266: 5-11 annexed hereto as **EXHIBIT "L"**).

73.　　In or around August 2014, Grimes-Jenkins alleges that she had a conversation with Jon Mak, a Senior Human Resources Specialist, at the Manhattan Substations, in which she requested a transfer due to unspecified hardships. (Grimes-Jenkins Dep. 266:24-268:13.) Grimes-Jenkins did not document this meeting, and there were no witnesses to this conversation. (Grimes-Jenkins Dep. 266:24-268:13.) Grimes-Jenkins is unclear whether she reported this conversation to her union. (Grimes-Jenkins Dep. 271:3-10.) Grimes-Jenkins admits that Mak did not have the power to issue a transfer to any location. (Grimes-Jenkins Dep. 261:8-20; 269:12-270:2.).

**RESPONSE:** Denies. Denies in that Plaintiff is very clear she reported the conversation to her Supervisor, Mr. Nolan. See Grimes Dep 268: 14-25, 269: 2-7 annexed hereto as **EXHIBIT "M"**.

> Q. Did you report that conversation to anyone?
>
> A. Oh, yeah, I told Nolan about it. I told my supervisor about it. And you know, I told my supervisor. I made a lot of comments about that, and at this point, I was

trying not, you know, like keep a low profile because I'm being told all the time I'm trouble, you know, I'm a troublemaker. I'm trying to keep a low profile now.

Q. When you say you told your supervisor about it, who do you mean?

A. I told Nolan that he said this to me.

Q. You mean Nolan as your supervisor?

A. Yeah. Uh-huh. He threatened me, John Mak. He said, I can send you to Staten Island. You want a transfer? I'll send you there. I have that area.

74.   Since June 7, 2013, Grimes-Jenkins had applied to only two postings, which she did not receive. (Roett Decl. ¶ 3.).

**RESPONSE:** Admit.

75.   On May 27, 2015, Grimes-Jenkins applied for a Supervisor, Senior Instruction Position within the Manhattan Substations, which was posted on May 18, 2015. (Grimes-Jenkins Dep. 266:5-23.) Grimes-Jenkins was selected for a telephone screening on June 10, 2015; however, she voluntarily withdrew from consideration, and thus did not receive the position. (Roett Decl. Ex. A.) The positing went to Wells, an African American woman. (Roett Decl. Ex. A.).

**RESPONSE:** Admit.

76.   On March 29, 2017, Grimes-Jenkins applied for a Clerical Assistant position within Gas Operations Department, which was posted on March 27, 2017. (Roett Decl. ¶ 5, Ex. B.) Grimes-Jenkins was rejected from consideration because she did not possess a satisfactory attendance record, and thus did not receive the position. (Roett Decl. Ex. B.).

**RESPONSE:** Admit as to the denial without admission as to the basis for the denial.

77.   Grimes-Jenkins never indicated in writing or during any fact-finding interviews that she believed that she was denied any promotion opportunities because of race or gender

discrimination, including any purported posting for a supervisor position in the Manhattan Substations or a Clerical Assistant posting with Gas Operations. (Grimes-Jenkins Dep. 266:5-23.).

**RESPONSE:** Denies, subject to the reports and the actual testimony. The testimony cited by the Defendant in support of this statement is unrelated and inaccurate as to the claimed proposition. (See Grimes 266: 2-25 **EXHIBIT "L"** as annexed).

78.   While Grimes-Jenkins indicated that other employees were willing to swap positions with her, Grimes-Jenkins failed provide any documents indicating that she notified the union or her Business Agent of these employees and their consent to a swap. (Grimes-Jenkins Dep. 262:13-266:4 **EXHIBIT "L"** as annexed).

**RESPONSE:** Denies, subject to the reports and the actual testimony. The statements set forth herein are inconsistent with statement #72, in which Defendant states there was no employee willing to swap, when indeed there was, which is stated by Plaintiff in her deposition. (See Grimes 263: 2-7 annexed hereto as **EXHIBIT "L"**).

79.   She also failed to identify specifically any union representative she spoke with regarding any purported swap. (Grimes-Jenkins Dep. 265:5-266:4.).

**RESPONSE:** Denied. (See Grimes 263: 2-7 annexed hereto as **EXHIBIT "L"**) as previously discussed.

**VII. GRIMES-JENKINS'S BASELESS HARASSMENT ALLEGATIONS**

80.   Con Edison personnel often refer to union employees such as Mechanics who work blue-collar jobs outside of the administrative offices as working in the "field," without respect to race or gender. (Grimes-Jenkins Dep. 234:13-235:7; Karakatsanis Decl. ¶ 12; Nolan Decl. ¶ 3.) This term of art is also commonly used in the public by government agencies

such as the federal Equal Employment Opportunity Commission and the New York Office of the Attorney General to refer to blue-collar women employed by Con Edison. (Pierre Decl. Ex. L.) To that end, Grimes-Jenkins has personally used the phrase "in the field" during her employment with Con Edison (Grimes-Jenkins Dep. 246:19-23.)

**RESPONSE:** Admit.

81.    Grimes-Jenkins believes that when used in the plural form, the phrase "into the fields" has a racial connotation that was directed towards African-American employees. (Grimes-Jenkins Dep. 234:13-235:7.)

**RESPONSE:** Admit.

82.    Grimes-Jenkins claims that Galloza and McEnery used the phrase "into the fields" as opposed to "in the field" towards her or African-Americans on only four occasions during her 27-year employment with Con Edison. (Grimes-Jenkins Dep. 234:13-235:7; 243:10-14.).

**RESPONSE:** Admits to the use of the phrase. Specifically, Plaintiff has heard of the phrase, but does not imply she in any way condones the use of the phrase.

83.    First, at an unspecified time in 2013, Grimes-Jenkins claims that she overheard a conversation involving Galloza and McEnery where Galloza stated that Walter Davis, an African-American; he should go "back into the fields." (Grimes-Jenkins Dep. 241:15-243:9.).

**RESPONSE:** Admit, subject to the actual testimony.

84.    Second, Grimes-Jenkins claims that Galloza told her "if you don't come up here and keep your mouth shut, I'm going to throw you into the fields" during the December 4, 2013

meeting held to address her November 2013 hardship transfer request. (Grimes-Jenkins Dep. 239:10-22; 256:15-257:16.).

**RESPONSE:** Admit.

85.     Third, Grimes-Jenkins claims that Galloza stated to her "if you keep complaining, I'm going to throw you back into the fields," when she approached him about her eventual complaint to the Ombudsman in 2015. (Grimes-Jenkins Dep. 239:10-240:3.) While Grimes-Jenkins alleges that she reported this comment to the Ombudsman during her April 24, 2015 fact finding interview, she believes the allegation was not properly recorded during the meeting. (Grimes-Jenkins Dep. 243:24-246:16; Foley Decl. ¶ 4.) Grimes-Jenkins admits that she did not review and was not provided a copy of the notes associated with her fact-finding meeting with the Ombudsman to confirm her belief. (Grimes-Jenkins Dep. 239:10-240:3).

**RESPONSE:** Admit.

86.     Fourth, Grimes-Jenkins claims that at an unspecified time McEnery once called her and asked her why she was working in the Astor location of the Manhattan Substations, and further stated that she "need[ed] to be back here with the good fields -- come out into the fields and do the work like field people have to do and work in the good fields like back in the day." (Grimes-Jenkins Dep. 233:20-235:7.).

**RESPONSE:** Admit.

87.     Grimes-Jenkins claims that she verbally complained about McEnery's use of the phrase "in the fields" to the Union to unspecified persons, but she cannot explain why she did not submit a formal written complaint documenting these complaints to the Union. (Grimes-Jenkins Dep. 240:4-15.).

**RESPONSE:** Admit.

88.   While Grimes-Jenkins alleges that Galloza did not use the phrase "into the fields" with White employees, she admits that she was not present to every conversation Galloza may have had with other employees outside of the administrative office at the Manhattan Substations. (Grimes-Jenkins Dep. 236:3-237:19.).

**RESPONSE:** Admit.

89.   While Grimes-Jenkins claims that McEnery did not use the phrase "into the fields" with White employees, she admits that she would not be able to know every conversation McEnery had with White employees at Con Edison. (Grimes-Jenkins Dep. 238:2-19.).

**RESPONSE:** Admit.

90.   Grimes-Jenkins did not complain about Galloza's alleged use of the phrase "in the fields" during her September 20, 2013, September 26, 2013, November 6, 2013, April 20, 2015, April 24, 2015, and April 20, 2016 fact finding interviews and complaints to Con Edison. (Grimes-Jenkins Dep. 152:10-153:9; 157:10-158:2; 207:22-208:14; Flynn Decl. Ex. D, F, G; Foley Decl. ¶¶ 3-5; Nolan Decl. Exs. B, C, D.).

**RESPONSE:** Admit, but subject to the testimony.

91.   Grimes-Jenkins did not complain about McEnery's alleged use of the phrase "in the fields" during her September 20, 2013, September 26, 2013, November 6, 2013, April 20, 2015, April 24, 2015, and April 20, 2016 fact finding interviews and complaints to Con Edison. (Grimes-Jenkins Dep. 152:10-153:9; 157:10-158:2; 207:22-208:14; Flynn Decl. Ex. D, F, G; Foley Decl. ¶¶ 3-5; Nolan Decl. Exs. B, C, D.).

**RESPONSE:** Denies, subject to the statements of the Plaintiff as set forth in her deposition.

92.   While Grimes-Jenkins alleges that she was "singled out and written up" for lateness associated with inclement weather, she admitted that her late arrivals were ultimately excused. (Grimes-Jenkins Dep. 310:7-16.) Further, Grimes-Jenkins does not recall receiving any written discipline for lateness due to weather in 2017. (Grimes-Jenkins Dep. 306:16-307:4.).

**RESPONSE:** Denies, subject to the statements of the Plaintiff as set forth in her deposition.

93.   Grimes-Jenkins does not believe that Nolan subjected her to discrimination or retaliation. (Grimes-Jenkins Dep. 99:18-101:2).

**RESPONSE:** Admit.

94.   Nolan consistently rated Grimes-Jenkins performance as "Satisfactory," except for a single Performance Review on June 10, 2014, based on substantiated violations of Con Edison's EEO Policy and Standards of Business Conduct. (Nolan Decl. Ex. E at CONED 000328 - CONED 000333.).

**RESPONSE:** Admit.

95.   The sole reason Grimes-Jenkins believes that Wells treated her differently is because she perceived that Wells did not like her personally. (Grimes-Jenkins Dep. 89:15-90:25.).

**RESPONSE:** Denies, though admits that was clearly part of the perception and ensuing claim.

96.   Grimes-Jenkins admits that comments attributable to McEnery regarding isolation or her past pregnancy occurred in the 1990s, well before June 7, 2013. (Grimes-Jenkins Dep. 203:11-204:3.).

**RESPONSE:** Denies.   The deposition testimony is clear, in that Plaintiff states that while comments did go back to the 1990, she goes on to state "So constantly he would

make these comments about me". (See Grimes 203:25, 204:2-3 as annexed,
**EXHIBIT "N"**).

97.     While Grimes-Jenkins claims that McEnery made racial comments during her

employment, she was only able to identify comments that occurred in 2004-2005 -- well

before June 7, 2013. (Grimes-Jenkins Dep. 205:7-206:17.).

**RESPONSE:** Admit, though noting that Plaintiff isolated these comments subject to the

deposition testimony and questions. Plaintiff states Tom McEnery made racial

comments every day, and stated one that really bothered her which happened in

2004-2005. See Grimes Dep 205: 7-25, 206:2-14. (See **EXHIBIT "N"** as annexed).

Q. When did Tom make the racial comments?

A. He makes -- he made them every day. It's constantly his thing. Upset a
lot of people.

Q. When -- when specifically can you remember a specific comment?

A. I'll give you one that really bothered me. He used to be a police officer,
and this is when we were working at Murray Hill. We were doing the EMF
shielding for Murray Hill. He didn't want to work with me because I was on
the job, and one of the guys questioned him, I can't remember what the
question was they asked of me, and they said to him, why don't you just go
back to the police department. And he said, I don't want to go back to the
police department because they're hiring a lot of -- a lot of blacks, so a lot
of trash is in the department now when good guys like me don't want to be
a part of it anymore. So he insinuated that black people that worked in the
police departments were trash.

Q. And when you said that's what happened when you were working in
Murray Hill?

A. Murray Hill, yes

Q. When was that?

A. This has got to be after the time when -- 2004, 2005, because there was
another situation with him that I had to speak to EricGalloza. Eric Galloza

actually was there when he harassed me with a group of guys, and Eric did nothing about it.

98.    Grimes-Jenkins did not report to Sheard as an Area Manager, and Grimes-Jenkins interacted with him infrequently while she worked at the Manhattan Substations. (Grimes-Jenkins Dep. 292:17-293:13.) Grimes-Jenkins cannot identify any witnesses for alleged comments she attributes to Sheard in 2014. (Grimes-Jenkins Dep. 293:14-295:14; ECF No. at 23-24.) Grimes-Jenkins also failed to report to Con Edison any alleged comments she attributes to Sheard in 2014. Grimes-Jenkins Dep. 152:10-153:9; 157:10-158:2; 207:22-208:14, 296:9-14; Flynn Decl. Ex. D, F, G; Foley Decl. ¶¶ 3-5; Nolan Decl. Exs. B, C, D.))

**RESPONSE:** Admit to the extent of the deposition question as phrased.

99.    Grimes-Jenkins admits that she was not present for comments allegedly made to Walter Davis by other unspecified employees regarding Grimes-Jenkins's presence in the Manhattan Substations. (Grimes-Jenkins Dep. 300:8-301:11; ECF No. 95 at 23-24.).

**RESPONSE:** Admit, but subject to the testimony.

**VIII. GRIMES-JENKINS'S TRANSITION BACK TO THE FIELD**

100.    In or around July 2016, Tommy Karakatsanis replaced Gavioli as General Manager of Manhattan Substations. (Grimes-Jenkins Dep. 271:23-272:13.) On March 27, 2017, Karakatsanis and Galloza met with Grimes-Jenkins to inform her that he decided to place her into the field effective April 10, 2017. (Grimes-Jenkins Dep. 273:22-274:9; Karakatsanis Decl. ¶ 13.).

**RESPONSE:** Admit.

101.   At the onset of the meeting, Karakatsanis explained that he expected a professional work environment within Manhattan Substations, where people feel included, and where people are cordial and respectful. (Grimes-Jenkins Dep. 273:2-273:21; Karakatsanis Decl. Ex. C.).

**RESPONSE:** Admit.

102.   Next, Karakatsanis informed Grimes-Jenkins that because of the shortage of mechanics and because she had no work restrictions that would otherwise prevent her from performing the traditional duties of a Mechanic A in the field, he was transferring her to the 63rd Street location for the Manhattan Substations to be placed into the field. (Grimes-Jenkins Dep. 273:22-274:14; Karakatsanis Decl. Ex. C.) He also explained that Engelhardt was remaining in administrative office because he had more seniority than Grimes-Jenkins did. (Grimes-Jenkins Dep. 273:22-274:14; Karakatsanis Decl. Ex. C.).

**RESPONSE:** Admit as to the actual statements without admission as to the veracity of the underlying claims and contentions.  Karakatsanis never explained to Plaintiff why Engelhardt was remaining administrative office like stated above. See Grimes Dep 273: 22-25, 274: 2-14. (See Grimes **EXHIBIT "O"** as annexed).

> Q. Okay. During the March 27, 2017 meeting, you also were told by Tommy K that, effective April 10, you would be working as an A Mechanic in the field; is that right?
>
> A. Yes.
>
> Q. And that, specifically, you would be working for Virginia Lecarie at the East 63rd Street substation?
>
> A. Correct.
>
> Q. And did he explain to you why he was making that transfer?
>
> A. He said a lot of things. Yes, he ...

> Q. Did he explain that because you were an A Mechanic with no restrictions, he needed to have more mechanics in the field versus working inside the office?
>
> A. Along those lines, yeah.

103.   To ensure her success in the field, Grimes-Jenkins would shadow other Mechanics to re-familiarize herself with various tools, techniques, and safety concerns. (Grimes-Jenkins Dep.7-285:8; Karakatsanis Decl. Ex. C.) Her new supervisor, Virginia Licari, would monitor her progress. (Grimes-Jenkins Dep. 284:7-285:8; Karakatsanis Decl. Ex. C.) She would then be eased into her new role through simple jobs, which would slowly increase her responsibilities. (Grimes-Jenkins Dep. 284:7-285:8; Karakatsanis Decl. Ex. C.).

**RESPONSE:** Admit.

104.   While Grimes-Jenkins did not report any instances of harassment or discrimination in this meeting, she did state that she believed that the transfer was retaliatory, without any basis besides speculation. (Grimes-Jenkins Dep. 274:18-276:13, 279:23-280:9; Karakatsanis Decl. Ex. C.) Prior to the March 27, 2017 meeting, Grimes-Jenkins had interacted with Karakatsanis, and had never reported any complaints based on those interactions. (Grimes-Jenkins Decl. 275:14-24; Karakatsanis Decl. Ex. C.) Karakatsanis was also unaware of her past transfer efforts or discussions with Gavioli. (Karakatsanis Decl. Ex. C.).

**RESPONSE:** Denies knowledge or information sufficient to form a belief as to what facts Karakatsanis was or was not aware.

105.   During the meeting, Grimes-Jenkins requested a transfer to another unspecified location. (Grimes-Jenkins Dep. 281:5-282:11; Karakatsanis Decl. Ex. C.) Karakatsanis advised her to follow protocol by speaking with her Union and Business Agent about a transfer. (Grimes-Jenkins Dep. 281:5-282:11; Karakatsanis Decl. Ex. C.) Otherwise, he was willing

to consider short-term accommodations upon sufficient notice to him and her new supervisor Licari to elevate any concerns she may have regarding childcare. (Grimes-Jenkins Dep. 282:12-283:21; Karakatsanis Decl. Ex. C.) Again, Grimes-Jenkins failed to facilitate a transfer with her union. (Karakatsanis Decl. C.).

**RESPONSE:** Denies as a mischaracterization of the testimony. (See Grimes 281: 2-25, 282: 2-25 as annexed hereto as **EXHIBIT "P"**).

## IX. PROCEDURAL HISTORY AND ACTIONABLE CLAIMS

106.   On April 3, 2014, Grimes-Jenkins filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"). (*See* ECF No. 53.).

**RESPONSE:** Admit noting the date is believed accurate.

107.   After receiving her a Right-To-Sue Letter from the EEOC, Grimes-Jenkins filed a Civil Complaint with the United States District Court for the Southern District of New York on June 23, 2016. (*See* ECF No. 1.).

**RESPONSE:** Admit noting the date is upon information and belief.

108.   On September 13, 2016, Grime-Jenkins filed her First Amended Verified Complaint pursuant to the parties' stipulation, which was so ordered by this Court on August 30, 2016 (*See* ECF. Nos. 8-9.).

**RESPONSE:** Admit.

109.   On June 22, 2017, this Court fully adopted the Report and Recommendation of Magistrate Judge Robert W. Lehrburger, in which this Court granted in part and denied in part Con Edison's Motion for Partial Dismissal of the First Amended Verified Complaint and Grimes-Jenkin's Motion for Leave to Amend the First Amended Verified Complaint. (*See* ECF No. 43.).

**RESPONSE:** Admit.

110. On July 20, 2017, Grimes-Jenkins filed her Second Amended Verified Complaint pursuant to this Court's June 22, 2017 Order, which is operative complaint in this action. (*See* ECF No. 46.).

**RESPONSE:** Admit.

111. On September 22, 2017, Con Edison filed its Answer and Affirmative and Other Defenses to the Second Amended Verified Complaint. (ECF No. 53.).

**RESPONSE:** Admit.

112. On June 12, 2018, Grimes-Jenkins filed a related action with the United States District Court for the Southern District of New York, which named Con Edison and Sean Green as Defendants, and alleged, among other things, causes of action associated with Grimes-Jenkins's termination of employment and allegations of sexual harassment associated with Sean Green. (*See* Related Action ECF No. 7.).

**RESPONSE:** Admit.

113. On April 5, 2019, this Court granted in part and denied in part Con Edison's Motion to Dismiss Grimes-Jenkins's Civil Complaint in the Related Action, dismissed all claims against Defendant Sean Green, and closed the Related Action. (Related Action ECF No. 37.) No claims asserted in the Related Action are actionable in the instant action. (Related Action ECF No. 37.).

**RESPONSE:** Admit.

114. Pursuant to the Court's June 22, 2017 Order and the Second Amended Complaint, the sole remaining claims are: (1) race and sex discrimination under a disparate treatment theory under the New York City Human Rights Law ("NYCHRL") based on conduct that

occurred on or after June 23, 2013, except for claims associated with the use of the phrase "going to the fields;" (2) retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII") based on conduct that occurred on or after June 7, 2013, with the exclusion of claims associated with any purported transfer request made in or around April 2015; (3) retaliation under the NYCHRL and NYSHRL of based on conduct that occurred on or after June 23, 2013, with the exclusion of claims associated with any purported transfer request made in or around April 2015; (4) hostile work environment claims based on race and gender under Title VII based on conduct that occurred on or after June 7, 2013, except for claims associated with the use of the phrase "going to the fields;" and (5) hostile work environment claims based on race and gender under the NYSHRL and NYCHRL based on conduct that occurred on or after June 23, 2013, except for claims associated with the use of the phrase "going to the fields."

**RESPONSE:** Admit.

115. Grimes-Jenkins was not subjected to actionable race discrimination. (*See* ECF No. 53.)

**RESPONSE:** Denies, and respectfully submits such is a legal determination not properly the subject of a statement of facts.

116. Grimes-Jenkins was not subjected to actionable gender discrimination. (*See* ECF No. 53.)

**RESPONSE:** Denies, and respectfully submits such is a legal determination not properly the subject of a statement of facts.

117. Grimes-Jenkins was not subjected to an actionable hostile work environment based on race. (*See* ECF No. 53.)

**RESPONSE:** Denies, and respectfully submits such is a legal determination not properly the subject of a statement of facts.

118.    Grimes-Jenkins was not subjected to an actionable hostile work environment based on gender. (*See* ECF No. 53.)

**RESPONSE:** Denies, and respectfully submits such is a legal determination not properly the subject of a statement of facts.

119.    Grimes-Jenkins was not subjected to actionable retaliation. (*See* ECF No. 53).

**RESPONSE:** Denies, and respectfully submits such is a legal determination not properly the subject of a statement of facts.


Dated: White Plains, New York
        January 24, 2020


                                    Respectfully Submitted,
                                    **JASNE & FLORIO, L.L.P.**
                                    *Attorneys for Plaintiff*


                                     /s/ Hugh G. Jasne, Esq.

                                    By: Hugh G. Jasne, Esq., (HGJ-5041)
                                    30 Glenn Street - Suite 103
                                    White Plains, New York 10603
                                    (914) 997-1212
                                    (914) 682-8692 (Fax)
                                    hgj@jasneflorio.com